IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

CONTANGO OPERATORS, INC. and §
CERTAIN UNDERWRITERS SEVERALLY §
SUBSCRIBING TO COMBINED COVER §
NOTE JHB-CJP-1718, §
§
Plaintiffs, §
§      CIVIL ACTION NO. H-11-0532
v. §
§
UNITED STATES OF AMERICA and §
WEEKS MARINE, INC., §
§
Defendants. §

## MEMORANDUM OPINION AND ORDER

Contango Operators, Inc. and certain non-operating working interest owners own a pipeline that runs along the floor of the Gulf of Mexico and six wells that are attached to the pipeline. In February of 2010 a dredge owned by Weeks Marine, Inc. ("Weeks Marine") struck and ruptured the pipeline. Contango and Certain Underwriters Severally Subscribing to Combined Cover Note JHB-CJP-1718 filed this action against Weeks Marine and the United States of America to recover for the ensuing damages.[1] The court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1333.

---

[1]Plaintiffs' Second Amended Complaint filed on December 10, 2013 (Docket Entry No. 148), adds the working interest owners as plaintiffs. The court will refer to the plaintiffs collectively as "Contango."

The parties tried the case to the court from December 9, 2013, to December 16, 2013.   After carefully considering the evidence, the stipulations of the parties, the parties' arguments, and their post-trial submissions, the court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a)(1).

## I.   **Background**[2]

Under the Rivers and Harbors Act of 1899 ("RHA"), 33 U.S.C. § 403, no submarine structure may be built in the navigable waters of the United States unless authorized by the United States Army Corps of Engineers (the "Corps").   Accordingly, in September of 2007 Contango filed with the Regulatory Division of the Corps an application for a permit to construct a natural gas pipeline in the Gulf of Mexico off the coast of Louisiana.[3]   The application stated that the pipeline would cross the "Atchafalaya Pass Channel."[4]   As part of the application review process an employee in the Regulatory Division cross-referenced a list of Corps-maintained channels to determine whether the "Atchafalaya Pass Channel" was a Corps-maintained channel.   Although the list did not explicitly

---

[2]The background is taken largely from the Undisputed Facts in the court's August 15, 2013, Memorandum Opinion and Order (Docket Entry No. 96, pages 2-8) and the Admissions of Fact in the Joint Pretrial Order (Docket Entry No. 97, pages 15-17).

[3]August 27, 2007, letter from T. Baker Smith, Inc. regarding Permit Application Submittal, Contango Exhibit 7.

[4]Id.

refer to an "Atchafalaya Pass Channel," it did include an area identified as the "Atchafalaya River, Bayous Chene, Boeuf & Black." At all times relevant to this litigation the channel labeled in Contango's permit application as the "Atchafalaya Pass Channel" was included within the "Atchafalaya River, Bayous Chene, Boeuf & Black." The court will refer to the area generally as the "Atchafalaya Channel." The Corps granted Contango a permit to construct its pipeline in November of 2007.[5] Information concerning the proposed placement of the Contango pipeline across the Atchafalaya Channel was not forwarded from the Regulatory Division of the Corps to the Waterways Division of the Corps.[6] The Waterways Division provides the locations of submarine pipelines to the engineers who prepare dredging contracts for Corps-maintained channels.[7]

After completing the pipeline in April of 2008 Contango provided as-built drawings that illustrated the intersection of the pipeline and the Atchafalaya Channel to the Minerals Management Service ("MMS"), the National Ocean Service ("NOS"), and the United States Coast Guard (the "Coast Guard"). No division within the Corps received the as-built drawings.

---

[5]Contango Exhibit 8.

[6]Joint Pretrial Order, Admission of Fact 5, Docket Entry No. 97, p. 5.

[7]Joint Pretrial Order, Admission of Fact 6, Docket Entry No. 97, p. 5.

In April of 2009 the Corps began to solicit bids on a contract to dredge the Atchafalaya Channel.[8] Corps engineers prepared project specifications that were provided to the bidders and would ultimately become part of the dredging contract.[9] Five submarine pipelines located in or near the Atchafalaya Channel were identified in the specifications; the Contango pipeline, however, was not listed.[10] Weeks Marine was awarded the contract in August of 2009.[11] The Contango pipeline was not identified in the dredging contract.[12]

The National Oceanic and Atmospheric Administration ("NOAA") is the federal agency tasked with the publication of nautical charts. Before November 25, 2009, the relevant NOAA charts -- Electronic Navigational Chart ("ENC") US4LA21E and Raster Navigational Chart ("RNC") 11351 -- displayed the Atchafalaya Channel without the Contango pipeline.[13] After receiving information from MMS about a new pipeline across the Atchafalaya

---

[8]Joint Pretrial Order, Admission of Fact 7, Docket Entry No. 97, p. 5.

[9]Joint Pretrial Order, Admission of Fact 8, Docket Entry No. 97, p. 16; Contango Exhibit 21.

[10]Joint Pretrial Order, Admission of Fact 8, Docket Entry No. 97, p. 16; Contango Exhibit 27, pages US 2278-79.

[11]Joint Pretrial Order, Admission of Fact 9, Docket Entry No. 97, p. 16.

[12]Id.

[13]Joint Pretrial Order, Admission of Fact 10, Docket Entry No. 97, p. 16.

Channel, NOAA published on its website the updated ENC US4LA21E on November 25, 2009, and the updated RNC 11351 on December 3, 2009.[14] Both the updated ENC and the updated RNC (collectively, the "updated NOAA charts") depicted the Contango pipeline.[15] The Coast Guard also publishes nautical information to the public in the form of a weekly Local Notice to Mariners ("LNM").[16] On December 2, 2009, the Coast Guard published LNM 48/09, announcing the addition of a submarine pipeline to the area displayed in the RNC. The updated NOAA charts and LNM 48/09 were published after Weeks Marine had been awarded the contract and had commenced dredging.[17]

On February 24, 2010, Weeks Marine's non-self-propelled dredging barge, the G.D. MORGAN, struck the Contango pipeline. The pipeline was ruptured, and Contango incurred losses as a result.[18] Contango's pipeline was shut-in for thirty-five days from the date it was struck until it was repaired and placed back in service.[19] During this thirty-five-day period Contango was not able to produce

---

[14]Joint Pretrial Order, Admission of Fact 11, Docket Entry No. 97, p. 17.

[15]Joint Pretrial Order, Admission of Fact 12, Docket Entry No. 97, p. 17.

[16]Joint Pretrial Order, Admission of Fact 13, Docket Entry No. 97, p. 17.

[17]Id.

[18]Joint Pretrial Order, Admissions of Fact 14 and 16, Docket Entry No. 97, p. 17.

[19]Joint Pretrial Order, Admission of Fact 17, Docket Entry No. 97, p. 17.

or sell gas or condensate from the wells connected to the pipeline.[20]

Contango alleges that the United States breached the duty to ensure that dredging activities did not interfere with or endanger the Contango pipeline. Contango alleges that Weeks Marine breached its duty to conduct dredging operations in a reasonable manner and that Weeks Marine is presumed to be at fault because Weeks Marine's moving vessel, the G.D. MORGAN, caused damage to a stationary object, the Contango pipeline. Contango also alleges that both defendants committed negligence per se based on violations of various federal maritime regulations governing the operation of the Weeks Marine dredging barge.

## II.  <u>Liability of the Parties</u>

**A.  Applicable Law**

To establish a negligence claim under admiralty law the plaintiff bears the burden to show that (1) the defendant owed the plaintiff a duty; (2) the defendant breached that duty; and (3) the breach caused the plaintiff's alleged injuries. <u>Canal Barge Co. v. Torco Oil Co.</u>, 220 F.3d 370, 376 (5th Cir. 2000). The duty owed -- i.e., the obligation to conform to a certain standard of care -- is a question of law for the court. <u>Theriot v. United States</u>, 245 F.3d 388, 400 (5th Cir. 1998). Whether that duty was breached is

---

[20]Joint Pretrial Order, Admission of Fact 18, Docket Entry No. 97, p. 17.

a question of fact.  Id. at 394.  In an allision[21] case the standard of care is reasonable care under the circumstances.  Id. at 400; Southern Natural Gas Co. v. Pontchartrain Materials, Inc., 711 F.2d 1251, 1254 (5th Cir. 1983).  The duty owed by the United States in a suit brought against it pursuant to the Suits in Admiralty Act is "'equal to that of a private person in like circumstances.'" Southern Natural Gas, 711 F.2d at 1254 (quoting Canadian Pac. (Bermuda) Ltd. v. United States, 534 F.2d 1165, 1168 (5th Cir. 1976)).

The "existence and scope of a duty" depends on the "'foreseeability of the harm suffered by the complaining party.'" In re Great Lakes Dredge & Dock Co. LLC, 624 F.3d 201, 211 (5th Cir. 2010) (quoting Consolidated Aluminum Corp. v. C.F. Bean Corp., 833 F.2d 65, 67 (5th Cir. 1987)).  The duty to use reasonable care is "owed only with respect to the interest that is foreseeably jeopardized" by the alleged conduct.  Great Lakes Dredge, 624 F.3d at 211 (internal quotation marks omitted).  In the Fifth Circuit a harm is considered

> a foreseeable consequence of an act or omission if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention.

Id. (internal quotation marks omitted).

---

[21]"An allision is a collision between a moving vessel and a stationary object."  2 Thomas J. Schoenbaum, Admiralty & Maritime Law § 14-2 (3d ed. 2001).

Two Fifth Circuit decisions involving damages to pipelines are instructive in identifying the duties of the defendants in this case. Michigan Wisconsin Pipeline v. Williams-McWilliams, 551 F.2d 945 (5th Cir. 1977), involved an allision between a dredge and a pipeline. The pipeline had been constructed pursuant to a permit from the Corps of Engineers, but the specifications attached to the dredger's government contract did not show the pipeline crossing the area to be dredged. 551 F.2d at 948. The contract also contained two "site inspection clauses" in which the dredger agreed to take steps "reasonably necessary to ascertain the nature and location of the work and the general and local conditions which can affect the work and the cost thereof" and to "acknowledge that he ha[d] investigated and satisfied himself as to the conditions affecting the work." Id. at 949 (internal quotation marks omitted). After the accident the pipeline owner sued the dredger for damages. Id. at 947. The dredger filed a third-party complaint, arguing that the United States was at fault for providing specifications that failed to show the pipeline. Id. at 947.

The district court in Michigan Wisconsin found in favor of the pipeline owner and against the dredger, and dismissed the dredger's third-party complaint. Id. Affirming the judgment against the dredger and reversing the dismissal of the complaint against the United States, the Fifth Circuit held the United States may be held liable where it has "by a prolonged course of conduct [led] a

contractor to expect that when certain kinds of material structures are present in an area in which a contract is to be performed that the structures will be shown on the specifications drawings." Id. at 951.  The court held that "the absence of a depiction" of a pipeline amounted to a "positive assertion" or "representation" on which a dredger-contractor was entitled to rely, "given a prolonged course of conduct justifying contractor reliance on the [United States] providing this information one way or the other in specifications drawings." Id. (internal quotation marks omitted). The court concluded that the Corps' regular practice of depicting pipelines on the specifications attached to dredging contracts amounted to such a course of conduct.  Id. at 952-53.  Moreover, the court held that "government contractors . . . are not obligated to make an independent investigation" into the accuracy of "positive assertions" made by the United States.  Id. at 953.  The court summarily rejected the United States' attempt to exculpate itself by virtue of the "site inspection clauses," reasoning that such provisions do not shift the liability that flows from the United States' representations.  Id.

The facts of Southern Natural Gas are similar to those of Michigan Wisconsin:  The Corps issued permits to a pipeline company to construct several submarine pipelines; the Corps also issued dredging permits to several dredgers; and the dredging permits specifically prohibited dredging near some pipelines, but did not make any specific mention of the plaintiff company's pipelines.

<u>Southern Natural Gas</u>, 711 F.2d at 1251.  The dredger subsequently struck one of the plaintiff's pipelines.  <u>Id.</u> at 1254.  Affirming the district court's judgment against the United States, the Fifth Circuit held that "by specifically prohibiting dredging activities in the vicinity of one gas company's pipelines, the Corps was obligated to prohibit dredging near other companies' pipelines in the area."  <u>Id.</u> at 1256.  The court further held that "[t]he Corps knew that the dredging companies' activities would be incompatible with the submarine gas pipelines, and that a great potential for an accident existed.  The Corps had the power to prevent this danger. Its failure to do so subjects it to liability under the [SAA]." <u>Id.</u>  The Fifth Circuit characterized the United States' duty as a "duty to warn," which the court hypothetically noted may be satisfied by a "simple notice or warning of a particular hazard or activity, or the prohibition of a certain activity."  <u>Id.</u>

**B.   Liability of the United States**

The United States owed Contango a duty of reasonable care. <u>See</u> <u>Theriot</u>, 245 F.3d at 400; <u>Southern Natural Gas</u>, 711 F.2d at 1254.  The scope of this duty depends on the foreseeability of the harm suffered by Contango -- i.e., the damage to its pipeline as a result of an allision.  <u>See</u> <u>Great Lakes Dredge</u>, 624 F.3d at 211. The court concludes that the allision by the Weeks Marine dredge and the resulting damage to the pipeline were foreseeable consequences of the failure of the Corps to include the Contango

-10-

pipeline in the dredging contract specifications. See Southern Natural Gas, 711 F.2d at 1256 ("The Corps knew that the dredging companies' activities would be incompatible with the submarine gas pipelines, and that a great potential for an accident existed."). Because the United States' duty arose out of the omission of the pipeline in the dredging contract, the court concludes that the duty is properly characterized as a duty to warn or notify Weeks Marine of the Corps' error.   The United States was required to exercise reasonable care in carrying out that duty.

Michigan Wisconsin and Southern Natural Gas support the court's conclusion.  As in Michigan Wisconsin, in this case the United States made a "positive assertion" regarding the Contango pipeline.  The evidence at trial, including the testimony of Corps' employees, established that the Corps knew that dredging contractors such as Weeks Marine rely on the specifications provided by the Corps in bidding on dredging contracts and that Weeks Marine relied on the Corps' specifications that did not show the Contango pipeline.  By identifying five other pipelines in the area, and omitting the Contango pipeline, the Corps represented that the Contango pipeline was not located in the area to be dredged by Weeks Marine.  See Michigan Wisconsin, 551 F.2d at 951; see also Southern Natural Gas, 711 F.2d at 1256 ("[B]y specifically prohibiting dredging activities in the vicinity of one gas company's pipelines, the Corps was obligated to prohibit dredging near other companies' pipelines in the area.").

The court concludes that the United States breached its duty of reasonable care by failing to include the Contango Pipeline in the specifications provided to Weeks Marine when it bid on the contract to dredge the Atchafalaya Channel and in failing to warn or notify Weeks Marine of the existence of the Contango Pipeline before Weeks Marine's barge struck the pipeline on February 24, 2010. The United States' breach of its duty to exercise reasonable care was a cause of the allision between the Weeks Marine barge and the Contango pipeline and of the damages suffered by Contango.

The United States argues that it discharged its duty to Weeks Marine by the issuance of an updated NOAA chart and LNM 48/09. The evidence at trial does not support this argument. Nothing in Weeks Marine's contract with the Corps required Weeks Marine to independently determine whether there were pipelines that crossed the Atchafalaya Channel other than those identified in the Corps' specifications. The evidence at trial established that in issuing dredging contracts the Corps does not require dredging contractors to make independent investigations as to other possible pipelines or obstructions. The evidence also established that the custom and practice in the dredging industry was not to rely on NOAA charts or LNMs in order to identify pipelines, but instead to rely on the specifications provided by the Corps in identifying pipelines that might be damaged by dredging, and that the Corps was aware of this industry custom and practice. The court therefore concludes that

the United States could not have reasonably relied on publication of the updated NOAA charts or the LNM to satisfy its duty.[22]

## C.   Liability of Weeks Marine

### 1.   Liability As a Dredger

Weeks Marine contends that it owed no duty to Contango under the facts of this case.  Weeks Marine argues that it acted as a reasonable dredger when it relied on the assertions from the Corps that only five pipelines were implicated by the project.  Weeks Marine argues that if the Corps had identified the Contango pipeline in its contract specifications, Weeks Marine would have learned of the location of the pipeline and the allision would never have occurred.  Weeks Marine argues that its barge, the G.D. MORGAN, was not required under applicable maritime regulations or customary industry practice to have a licensed mariner on board or to utilize NOAA charts or LNMs while dredging the Atchafalaya Channel.

Contango argues that Weeks Marine owed Contango a duty of care to avoid striking the pipeline and that Weeks Marine's failure to independently investigate the existence of pipelines in the area to

---

[22]The United States also contends that the failure of Contango to provide the Corps with as-built drawings of the Contango Pipeline eliminated the duty of the Corps to identify the pipelines on the plans and specifications provided to Weeks Marine.  The court is not persuaded by this argument.  There was no credible evidence at trial that the absence of as-built drawings had any effect on the failure of the Corps to list the Contango pipeline in the specifications for the Atchafalaya Channel dredging contract.

be dredged constituted a breach of that duty.  Contango argues that there was no justifiable reliance by Weeks Marine because Weeks Marine undertook no independent investigation of pipelines in the area to be dredged but instead relied solely on the contract specifications provided by the Corps.  Contango argues that the dredging contract alerts Weeks Marine to the possibility of "unidentified pipelines."[23]

As discussed above in Part II.A, Weeks Marine's duty to Contango was one of reasonable care, and the scope of that duty is defined by the foreseeability of the harm suffered by Contango.  An allision with a submarine pipeline is a foreseeable consequence of dredging when the dredger is not aware of the pipeline.  The court therefore concludes that Weeks Marine was under a duty to act reasonably to avoid striking the Contango pipeline.

Whether this duty was breached is a question of fact.  See Theriot, 245 F.3d at 394. In addition to the facts recited in Part I above, the evidence at trial established that Jennifer Caldwell Price was the Weeks Marine project engineer for the dredging contract.  Her primary duty was to ensure compliance with the dredging contract documents.  Price relied on the Corps' identification of pipelines in the contract documents and only verified the locations of pipelines identified by the Corps.  In November of 2009 Price downloaded NOAA Chart 11351 to her personal

_____

[23]See Contango Exhibit 27, ¶ 3.2.4.

laptop computer to orient herself to areas where the barge would be working. Price was familiar with NOAA charts. Although Price used Chart 11351 to assist in the dredging operations, she did not use the chart to determine the location of pipelines. The Contango pipeline did not appear on the NOAA chart when Price downloaded it. Price uploaded Chart 11351 onto various computers on board the dredge; and the chart was available for use by senior members of the crew including the dredge captain, leverman and project engineer. The NOAA chart was updated on November 25, 2009, to show that the Contango pipeline crossed the Atchafalaya Channel.

At trial Price acknowledged the known danger of dredging in an area with underwater hazards such as pipelines containing highly flammable pressurized natural gas, and that Weeks should use all reasonably available resources to avoid striking a pipeline during dredging operations. She acknowledged that the barge had internet access and that during dredging operations she or other Weeks Marine employees on the barge could have accessed the NOAA website after November 25, 2009, and discovered the Contango pipeline. The captain of the barge, Jack Dunbar, testified that NOAA charts were on board the G.D. MORGAN and that current NOAA charts could have been used to identify pipelines, although it was not the custom and practice in the dredging industry to do so. Dunbar also acknowledged that he had access to LNM 40/09, which showed the Contango pipeline.

-15-

Although Weeks Marine's witnesses testified that it was common practice in the dredging industry to rely on pipeline information provided by the Corps in dredging specifications and contracts and that Weeks Marine followed the practice, given the significant damage that could result from striking a pipeline, the availability of current pipeline data in NOAA charts and LNMs, and the ease of accessing such data, the court concludes that it was unreasonable for Weeks Marine to rely solely on pipeline information provided earlier by the Corps in the contract specifications and dredging contract. Therefore, regardless of whether the Corps' practice of identifying pipelines constituted a "prolonged course of conduct," see Michigan Wisconsin, 551 F.2d at 951, Weeks Marine's sole reliance on information provided by the Corps did not satisfy its duty in this case to exercise reasonable care in its dredging operations. Weeks Marine's breach of its duty to exercise reasonable care was a cause of the allision between its barge and the Contango pipeline and of the damage suffered by Contango.

Contango also contends that a presumption of fault applies against Weeks Marine because its dredge, the G.D. MORGAN, allided with Contango's stationary pipeline. Weeks Marine responds that the presumption does not apply and, in the alternative, that the presumption has been rebutted. Where a non-self-propelled vessel and a stationary object allide, the rule of THE LOUISIANA, 3 Wall. (70 U.S.) 164 (1865), creates a presumption of fault that shifts the burden of proof to the party in control of the vessel. Combo

-16-

Maritime, Inc. v. U.S. United Bulk Terminal, LLC, 615 F.3d 599, 604 (5th Cir. 2010).   In allisions involving a sunken stationary object, the presumption only applies where the party in control of the vessel "knew or should have known" of the existence of the stationary object.   Delta Transload, Inc. v. Motor Vessel, Navios Commander, 818 F.2d 445, 450 (5th Cir. 1987).   The party invoking the presumption bears the burden to prove knowledge.   Id. at 450-51.

To rebut the presumption, the party against whom the presumption applies bears the burden of disproving fault by a preponderance of the evidence.   James v. River Parishes Co., Inc., 686 F.2d 1129, 1133 (5th Cir. 1982).   The Fifth Circuit has outlined three ways in which a defendant can rebut the presumption. "The defendant can demonstrate that (1) the allision was the fault of the stationary object; (2) that the moving vessel acted with reasonable care; or (3) that the allision was an unavoidable accident."   Combo Maritime, 615 F.3d at 605 (quoting Fischer v. S/Y NERAIDA, 508 F.3d 586, 593 (11th Cir. 2007) (internal quotation marks omitted).

Because the court has concluded that Weeks Marine should have discovered the Contango pipeline by referring to readily available NOAA charts or LNMs, the court concludes that Weeks Marine should have known of the existence of the pipeline and that THE LOUISIANA rule creates a presumption of fault.   Because Weeks Marine's allision with the Contango pipeline was not the fault of the

pipeline or an unavoidable accident, and because Weeks Marine has failed to establish that it acted with reasonable care, the court concludes that Weeks Marine is also liable to Contango for the damages arising out of the allision under THE LOUISIANA rule.

## 2.   Liability Under Maritime Law

Contango and the United States argue that because the G.D. MORGAN was a vessel in navigation, Weeks Marine owed Contango additional duties beyond the duty to act with reasonable care under the circumstances.[24]   They argue that the general maritime law imposes an affirmative duty on the G.D. MORGAN to carry up-to-date charts and LNMs and to have a crew of licensed mariners.[25]   Contango also argues that the G.D. MORGAN was required by regulation to do so.[26]

(a)   The regulations cited by Contango do not apply to the G.D. MORGAN.

The regulations cited by Contango are part of a detailed regulatory framework in which vessels are classified by weight, purpose, and method of propulsion.  See generally 46 C.F.R. ch. 1. Method of propulsion is divided into four categories:  (1) motor,

---

[24]Plaintiffs' Post-Trial Brief on Weeks Marine's Liability as Vessel Owner and Operator, Docket Entry No. 161; The United States of America's Ultimate Findings of Fact, pp. 10-11.

[25]Id.

[26]Plaintiffs' Post-Trial Brief on Weeks Marine's Liability as Vessel Owner and Operator, Docket Entry No. 161.

(2) sail, (3) steam, and (4) non-self-propelled.   See 46 C.F.R. § 24.05-1 tbl.25.05-1(a); 46 C.F.R. § 90.05-1 tbl.90.05-1(a). Whether a vessel is subject to a particular regulation often depends upon its classification within one of those four categories.   In response to Weeks Marine's argument that the cited regulations do not apply to non-self-propelled vessels, Contango argues that the G.D. MORGAN's ability to move itself short distances through the use of its spuds, anchors, and cables constitutes self-propulsion.

Contango cites the Supreme Court's language in Stewart v. Dutra, 125 S. Ct. 1118 (2005), describing a dredge's ability to "navigate[] short distances by manipulating its anchors and cables" as a "limited means of self-propulsion." Id. at 1121.   The issue in Stewart was whether the dredge was a vessel under 1 U.S.C. § 3 for purposes of the Longshore and Harbor Workers Compensation Act. Id. at 1129.   Because the dredge was used "to transport equipment and workers over water," the Court held that the dredge was a vessel.   Id. at 1128–29.

Weeks Marine acknowledges that the G.D. MORGAN is a vessel under Stewart, but argues that it should be classified as a non-self-propelled vessel for purposes of the regulations.   Weeks Marine points to cases where similar dredges were referred to as non-self-propelled.   See Warrior Energy Servs. Corp. v. ATP TITAN, 941 F. Supp. 2d 699, 704 (E.D. La. 2013), aff'd, No. 13-30587, 2014

WL 31410 (5th Cir. Jan. 6, 2014); <u>Great Lakes Bus. Trust v. M/T</u>
<u>ORANGE SUN</u>, 855 F. Supp. 2d 131, 136 (S.D.N.Y. 2012), <u>aff'd</u>, 523
F. App'x 780 (2d Cir. 2013); <u>see also</u> <u>Michigan Wisconsin</u>, 551 F.2d
at 949; <u>Andersen v. Olympian Dredging Co.</u>, 57 F. Supp. 827, 828
(N.D. Cal. 1944).

Although none of these cases addressed self-propulsion in the
context of the regulations cited by Contango, the court agrees with
Weeks Marine that the G.D. MORGAN is a non-self-propelled vessel
for purposes of the regulations.  "The phrase nonself-propelled
vessel means a vessel without sufficient means for self-propulsion
and is required to be towed." 46 C.F.R. § 90.10-36.  The G.D.
MORGAN is required to be towed long distances and can only move
short distances using its spuds, anchors, and cables.  Furthermore,
Contango does not contend that the G.D. MORGAN is propelled by
motor, sail, or steam.  Accordingly, if the G.D. MORGAN is to be
classified within the regulatory framework, it must be classified
as a non-self-propelled vessel.  The court will therefore address
the applicability of each regulation cited by Contango to the G.D.
MORGAN as a non-self-propelled vessel.

### (i)   33 C.F.R. §§ 164.30 and 164.33

Contango contends that the G.D. MORGAN was required to carry
up-to-date charts and LNMs under 33 C.F.R. §§ 164.30 and 164.33.
However, these regulations apply only to "self-propelled vessel[s]
of 1600 or more gross tons." 33 C.F.R. § 164.01.  As explained

-20-

above, the G.D. MORGAN is not a self-propelled vessel.  Nor is it more than 1600 gross tons.[27]  Accordingly, these regulations do not apply to the G.D. MORGAN.

### (ii) 46 C.F.R. § 26.03-4

Contango contends that the G.D. MORGAN was required to carry up-to-date charts and LNMs under 46 C.F.R. § 26.03-4.  Whether this regulation applies to the G.D. MORGAN depends upon its classification within Table 24.05-1(a).  46 C.F.R. § 24.05-1.  As explained above, the G.D. MORGAN is a non-self-propelled vessel. It is also over 100 gross tons, placing it in row (4) of Table 24.05-1(a).  Section 26.03-4 applies only to vessels indicated in column five of Table 24.05-1(a), which in row (4) corresponds to "barges carrying passengers or passengers-for-hire."  46 C.F.R. § 24.05-1.  Because the G.D. MORGAN does not carry passengers or passengers-for-hire, it is not subject to the requirements of § 26.03-4.

### (iii) 46 C.F.R. § 97.05-5

Contango contends that the G.D. MORGAN was required to carry up-to-date charts and LNMs under 46 C.F.R. § 97.05-5.  Section 97.05-5 applies to "all vessels except barges, vessels operating exclusively on rivers, and motorboats other than those certificated for ocean or coastwise route."  46 C.F.R. § 9.05-5.  The term

---

[27]Contango Exhibit 115, page 9.

"barge" is defined to mean "any nonself-propelled vessel." 46
C.F.R. § 90.10-3. As explained above, the G.D. MORGAN is a non-
self-propelled vessel and therefore a barge under § 90.10-3.
Accordingly, § 97.05-5 does not apply to the G.D. MORGAN.

Contango argues that the G.D. MORGAN cannot be a barge because
it is an "industrial vessel" under 46 C.F.R. § 90.10-16. Weeks
Marine acknowledges that the G.D. MORGAN is an industrial vessel,
but argues that the terms are not exclusive and that it is also a
barge under 46 C.F.R. § 90.10-3. The court agrees with Weeks
Marine. Vessels falling within the definition of "industrial
vessel" are subject to various requirements under the regulations.
See, e.g., 46 C.F.R. § 92.07-10 (requiring that "[t]he hull,
superstructure, structural bulkheads, decks, and deckhouses" of
certain industrial vessels "shall be constructed of steel"). It is
clear that these requirements are imposed on vessels meeting the
definition of industrial vessel in addition to any requirements
otherwise imposed due to their classification within the overall
regulatory framework. Indeed, the definition of "industrial
vessel" indicates that the term includes "drill rigs, missile range
ships, dredges, cable layers, derrick barges, pipe lay barges,
construction and wrecking barges." Accordingly, the court
concludes that the G.D. MORGAN is both an industrial vessel and a
barge for purposes of the regulations.

Furthermore, the term "vessel" as used in § 97.05-5 is defined
to mean "all vessels indicated in Column [4] of Table 90.05-1(a)."

46  C.F.R.  §  90.10-37.[28]      Table  90.05-1(a)  indicates  that

non-self-propelled  vessels  greater  than  100  tons  are  only  subject

to  the  requirements  of  Subchapter  I,  which  includes  §  97.05-5,  if

they  are  "seagoing  barges."   46  C.F.R.  §  90.05-1  tbl.90.05-1(a).

"Seagoing  barge"  is  defined  in  46  C.F.R.  §  90.10-36.   Contango  has

not  established  that  the  G.D.  MORGAN  is  a  seagoing  barge,  nor  does

it  argue  that  the  G.D.  MORGAN  is  motor,  sail,  or  steam  powered.

Accordingly,  the  court  concludes  that  §  97.05-5  does  not  apply  to

the  G.D.  MORGAN.

### (iv)  46  C.F.R.  §  15.701(b)

Contango  contends  that  46  C.F.R.  §  15.701(b)  requires  the  G.D.

MORGAN  to  have  licensed  crew  members.   However,  §  15.701(b)  does

not  apply  to  barges.   46  C.F.R.  §  15701(a)(3).   As  explained  above,

the  G.D.  MORGAN  is  a  barge.[29]   Furthermore,  §  15.701(b)  only  applies

---

[28]There  is  an  error  in  §  90.10-37  indicating  that  the  term
"vessel"  means  "all  vessels  indicated  in  Column  5  of  Table
90.05-1(a)."   46  C.F.R.  §  90.10-37.   When  §  90.10-37  was  originally
published  in  1965,  Column  5  of  Table  90.05-1(a)  referred  to
"Vessels  inspected  and  certificated  under  Subchapter  I—Cargo  and
Miscellaneous  Vessels."    Final  Rule,  30  Fed.  Reg.  16970,  16971,
16973  (Dec.  30,  1965).    Table  90.05-1(a)  was  revised  in  2002.
Safety  of  Uninspected  Passenger  Vessels  Under  the  Passenger  Vessel
Safety  Act  of  1993  (PVSA),  67  Fed.  Reg.  34756,  34792-98  (May  15,
2002).    As  revised,  the  classification  of  vessels  inspected  and
certificated  under  Subchapter  I—Cargo  and  Miscellaneous  Vessels
corresponds  to  Column  4  of  Table  90.05-1(a).    Id.    Although  46
C.F.R.  §  90.05-1(a)  was  revised  to  indicate  that  Subchapter  I
applies  to  "all  U.S.-flag  vessels  indicated  in  Column  4  of  Table
90.05-1(a),"  §  90.10-37  was  not  similarly  updated.   See  id.   A
similar  error  appears  in  46  C.F.R.  §  90.01-1.

[29]Although  the  term  "barge"  is  not  defined  for  purposes  of
Subchapter  B,  which  includes  §  15.701(b),  the  regulations
(continued...)

to vessels "navigating seaward of the Boundary Lines" established in 46 C.F.R. §§ 7.1 to 7.180.  <u>Id.</u> § 15701(a).  Contango has not established that the G.D. MORGAN navigated seaward of the Boundary Lines.  Accordingly, 46 C.F.R. § 15.701(b) does not apply to the G.D. MORGAN.

> (b)   The general maritime law does not impose an affirmative duty on the G.D. MORGAN to carry up-to-date charts and LNMs or to have a crew of licensed mariners.

Contango and the United States argue that even in the absence of a regulatory requirement, the general maritime law imposes a duty on the G.D. MORGAN to carry up-to-date charts and LNMs and to have a crew of licensed mariners.  They argue that this duty arises from the duty to act as a reasonably prudent mariner.[30]  Weeks Marine argues that the duty to act as a reasonably prudent mariner only applies "'where there is no applicable standard of statutory conduct,'" <u>quoting</u> <u>In re Luhr Bros., Inc.</u>, 325 F.3d 681, 687 (5th Cir. 2003), and that the body of regulations cited by Contango regulate the entire field of maritime shipping and navigation.[31]  The court agrees with Weeks Marine.

---

[29](...continued)
consistently define the term to mean a "non-self-propelled vessel." <u>See</u> 46 C.F.R. §§  24.10-1, 90.10-3, 188.10-5; <u>see also</u> 46 U.S.C. § 102 ("In this title, the term 'barge' means a non-self-propelled vessel.").

[30]Plaintiffs' Post-Trial Brief on Weeks Marine's Liability as Vessel Owner and Operator, Docket Entry No. 161, pp. 5-7; The United States of America's Ultimate Findings of Fact, pp. 10-11.

[31]Weeks Marine, Inc.'s Reply to Contango's Post-Trial Brief on Weeks Marine's Liability as Vessel Owner and Operator, Docket Entry No. 169, pp. 13-14.

The regulatory framework discussed above establishes in detail whether a vessel is required to carry updated charts and LNMS or to have a crew of licensed mariners.  To assess "whether the vessel's navigator has acted as a reasonably prudent mariner under the circumstances . . . the navigator's conduct is measured against accepted standards of navigation," which are "derived from the statutory rules of navigation, regulations having the full force of law, proved local custom not contradicting statutory rules, and the requirements·of due care and good seamanship." Peoples Natural Gas Co. v. Ashland Oil, Inc., 604 F. Supp. 1517, 1523 (W.D. Pa. 1985) (citing Gilmore & Black, The Law of Admiralty § 7-3, at 488 (2d ed. 1975)).  The court has heard the evidence and concludes that the general maritime law does not impose an affirmative duty on the G.D. MORGAN to carry updated charts and LNMs or to have a crew of licensed mariners because the tugs that towed the G.D. MORGAN during the dredging project had updated charts and LNMS and were manned by licensed mariners.

**D.   Weeks Marine's Indemnity Argument**

Weeks Marine contends that under Michigan Wisconsin and Hollerbach v. United States, 34 S. Ct. 553 (1914), it was obligated to accept the government's representations in the dredging contract as true and therefore had no duty to Contango to consult updated charts prior to the date of the allision.[32]  Weeks Marine argues

---

[32]Weeks Marine, Inc.'s Post Trial Brief on Liability, Docket Entry No. 159, pp. 2-4.

that it is therefore entitled to indemnity from the United States for any liability imposed on it because of its sole reliance on the contract.[33]  The court finds both <u>Michigan Wisconsin</u> and <u>Hollerbach</u> to be distinguishable from the facts of this case.

<u>Hollerbach</u> involved a breach of contract claim by a contractor against the United States.  34 S. Ct. at 554–55.  The plaintiff contractor brought an action against the United States to recover costs that it incurred removing material from behind a dam.  <u>Id.</u> at 554.  The contract stated that the dam was backed with "broken stone, sawdust, and sediment."  <u>Id.</u>  In fact, the dam "was backed by cribwork . . . consisting of sound logs filled with stones," which was more expensive to remove.  <u>Id.</u> at 554–55.  The Court held that the government's representation of the character of the material backing the dam was a "positive statement of the specifications" and "must be taken as true and binding upon the government, and that upon it, rather than upon the claimants, must fall the loss resulting from such mistaken representations."  <u>Id.</u> at 556.  The court further noted that "[i]n its positive assertion of the nature of this much of the work [the government] made a representation upon which the claimants had a right to rely without an investigation to prove its falsity."  <u>Id.</u>

Unlike <u>Hollerbach</u>, this is not a breach of contract case. Indeed, the court has already determined that under the Contract Disputes Act it lacks jurisdiction to hear a contract claim by

_____

[33]<u>Id.</u> at 4–6.

Weeks Marine against the United States.[34]   Weeks Marine argues,
however, that "Michigan Wisconsin adopts the Hollerbach
principles"[35] and that under Michigan Wisconsin it was "obliged by
the law to accept the [g]overnment's warranty regarding the number
of pipelines as true."[36]   Weeks Marine points to the Supreme Court's
language in Hollerbach that the government's representations "must
be taken as true and binding upon the government," 34 S. Ct. at
556, to argue that it was obliged by law to accept the government's
representations in the contract as true.[37]   The court does not
interpret this language to mean that Weeks Marine was required to
accept the contract specifications as true even when it had ready
access to contrary and more recent information from the government.
Cf. D.F.K. Enterprises, Inc. v. United States, 45 Fed. Cl. 280, 285
(Fed. Cl. 1999) ("Without some valid basis for a contrary
conclusion (e.g., an absence of detrimental reliance by a
government contractor, or a failure to investigate sources which
would have revealed the truth), the government 'is liable for
damage attributable to misstatements of fact (in a contract or
specifications) which are representations made to the contractor.'"

---

[34]Memorandum Opinion and Order, Docket Entry No. 34, pp. 4-11;
Memorandum Opinion and Order, Docket Entry No. 96, pp. 8-12.

[35]Weeks Marine, Inc.'s Post Trial Brief on Liability, Docket
Entry No. 159, p. 9; see also id. at 2-3.

[36]Id. at 3.

[37]Id.

(quoting <u>Summit Timber Co. v. U. S.</u>, 677 F.2d 852, 857 (Ct. Cl. 1982))).

The facts of <u>Michigan Wisconsin</u> are discussed in detail in Part II.A above.   Important for purposes of applying <u>Michigan Wisconsin</u> to this case is the fact that in <u>Michigan Wisconsin</u> neither NOAA nor the Coast Guard had issued charts or announcements that identified the ruptured pipeline prior to the allision.  Here, NOAA charts and LNMs identifying Contango's pipeline were readily available to Weeks Marine employees before the allision.  The court has already concluded that given the significant damage that could result from striking a pipeline, the availability of current pipeline data, and the ease of accessing such data, it was unreasonable for Weeks Marine to rely solely on pipeline information provided earlier in the contract specifications.

<u>Penn Central Transportation Company v. United States</u>, 366 F. Supp. 1161 (D. Del. 1973), <u>aff'd</u>, 505 F.2d 730 (3d Cir. 1974), <u>cited in</u> <u>Michigan Wisconsin</u>, 551 F.2d at 951, is illustrative.  In <u>Penn Central</u> a dredger relied on the positive assertions of a Corps representative as to the location and depth of ten submarine electrical cables.  <u>Id.</u> at 1163.  The dredger contracted with the United States to dredge the Chesapeake and Delaware Canal ("C & D Canal").  <u>Id.</u> at 1166.  The contract "specified the location and elevation of a number of utility lines which crossed the C & D Canal" but "made no mention of the existence of the submarine cables."  <u>Id.</u>  The dredger was alerted to the existence of the

submarine cables by a third party, but was not told where they were located.  Id. at 1167.   The dredger then asked the Corps to identify the location and burial depth of the cables.  Id.  The dredger met personally with a Corps representative who provided it with incorrect information.  Id.  The dredger relied on this information and "made no independent investigation to determine the exact location of the cables."  Id.  The court held that the dredger "fulfilled the only duty which it owed to plaintiff or the United States when, the dredging contract being silent as to the existence or location of the cables, it reasonably inquired of the Corps where the cables were located and thereafter dredged in a reasonably prudent manner upon the basis of the information which it had received."  Id. at 1169.

Like the contract in Penn Central, the contract specifications here made no mention of the Contango pipeline.  Neither Weeks Marine nor the dredger in Penn Central had a duty to independently investigate the positive assertions in the contracts.  However, once contrary information was made available to it, a reasonable dredger could be expected to investigate their accuracy.  Cf. D.F.K. Enterprises, 45 Fed. Cl. at 285.  The evidence at trial established that the dredging project was to take place over several months in an area known to contain pipelines.  Although the dredger in Penn Central was actually aware of the existence of the submarine cables, a reasonable dredger in Weeks Marine's position can be expected to utilize readily available information,

particularly more recent information published by the government pertaining to the subject matter of the contract, to avoid the foreseeable consequences of dredging with incomplete or inaccurate information, especially given the ease of accessing the correct information and the significant damage that could result from striking a pipeline.

Weeks Marine also characterizes its indemnity argument as one for breach of warranty.  It argues that under <u>Michigan Wisconsin</u> the government's positive assertion in the contract specifications is a warranty that constitutes an implied promise to indemnify Weeks Marine.[38]  Arguing that Louisiana law applies, Weeks Marine contends that "a promisor which breaches a warranty cannot use the promisee's comparative negligence as a defense to its own breach."[39]  However, this is not a breach of warranty case, and whether the terms of the contract give rise to a claim for indemnity is a contract issue.   <u>Cf.</u> <u>D.F.K. Enterprises</u>, 45 Fed. Cl. at 285 ("[Plaintiff] argues that the alleged misrepresentation constitutes a breach of contract because it violates the 'implied warranty of the accuracy of contract documents.'   [Plaintiff's] claim is entirely dependent on the existence of a contract between it and the Corps, and . . . is in substance a claim for breach of contract by misrepresentation, or negligence, or both.").  As already noted,

---

[38]<u>Id.</u> at 4-8.

[39]<u>Id.</u> at 7.

the court lacks jurisdiction to consider a contract claim against the United States by Weeks Marine.[40]  Accordingly, the court will not adjudicate Weeks Marine's indemnity claims under the contract and concludes that Weeks Marine's argument that it was obligated to rely solely on the representations in the contract despite having ready access to more recent contrary information has no merit.

**E.    Weeks Marine's Government Contractor Defense**

Weeks Marine argues that "[t]he actions of Weeks [Marine] were the actions of the [United States] and thus, Contango must look to the [United States] for compensation."[41]  Weeks Marine states that the government contractor defense "is based on the premise that a private contractor performing acts for the government should not be liable for these acts if the federal government would be immune from liability had it performed the acts directly."[42]  Contango argues that Weeks Marine is not entitled to immunity because the United States is not entitled to immunity in this case.[43]  Contango

---

[40]Memorandum Opinion and Order, Docket Entry No. 34, pp. 4-11; Memorandum Opinion and Order, Docket Entry No. 96, pp. 8-12.

[41]Memorandum in Support of Motion for Summary Judgment on Behalf of Weeks Marine, Inc. – Government Contractor Defense ("Memorandum in Support"), attached to Motion for Summary Judgment on Behalf of Weeks Marine, Inc. – Government Contractor Defense, Docket Entry No. 59-1, p. 9.

[42]Id. at 10.

[43]Contango's Cross-Motion for Summary Judgment on the Government Contractor Defense, Docket Entry No. 82, p. 3.

also argues that the government contractor defense does not apply because Weeks Marine itself was negligent.[44]

"Government contractor immunity is derived from the government's immunity from suit where the performance of a discretionary function is at issue." <u>Kettsetter v. Pacific Scientific Co.</u>, 210 F.3d 431, 435 (5th Cir. 2000). Government contractors are therefore "entitled to assert the government's sovereign immunity in suits arising from [discretionary function] activities." <u>Bynum v. FMC Corp.</u>, 770 F.2d 556, 564 (5th Cir. 1985). The Suits in Admiralty Act contains a discretionary function exception. Although the United States has waived its immunity from tort suits under the Act, the exception bars suits against the United States for discretionary actions based on policy considerations. <u>Wiggins v. United States Through Dept. of Army</u>, 799 F.2d 962, 965 (5th Cir. 1986). The United States' failure to include the Contango pipeline in the contract specifications and subsequent failure to warn Weeks Marine of its error was not a discretionary action based on policy considerations. Therefore, the exception does not apply, sovereign immunity has been waived, and the government will be liable for breaching its duty to Contango.

A defendant asserting the government contractor defense must also establish that it did not exceed its authority in performing

---

[44]<u>Id.</u> at 3-4.

the contract.  In Yearsley v. W.A. Ross Constr. Co., 60 S. Ct. 413, 414 (1940), the Court held that if the "authority to carry out the project was validly conferred" and the contractor has not "exceeded his authority" in acting on behalf of the United States, "there is no liability on the part of the contractor for executing [the United States'] will."  Accordingly, under Yearsley a party acting on behalf of the government will be liable for actions causing injury to another if (1) the authority to carry out the contract was not validly conferred or (2) the contractor exceeded his authority in performing the acts that caused the injury.  The Fifth Circuit expanded upon the second prong in Ackerson v. Bean Dredging LLC, 589 F.3d 196 (5th Cir. 2009).  In Ackerson the court concluded that Yearsley barred a suit against the defendant-contractors, finding that the contractors had not "exceeded their authority" as a matter of law.  Id. at 207.  The court reasoned that the plaintiffs had alleged that the entire government project -- the subject of the contract -- caused the plaintiffs' injuries, "not any separate act of negligence by the [c]ontractor-[d]efendants."  Id.; see also City of Worcester v. HCA Mgmt. Co., Inc., 753 F. Supp. 31, 38 (D. Mass. 1990) (government contractor not entitled to immunity where "the harm was caused by the [contractor's] own tortious conduct").  The government contractor defense therefore requires a contractor to have acted without negligence in performing actions pursuant to a contract.

-33-

Because the government contractor defense is an affirmative one, Weeks Marine bore the burden of proof at trial. <u>Bailey v. McDonnell Douglas Corp.</u>, 989 F.2d 794, 802 (5th Cir. 1993). The court concludes that Weeks Marine has failed to establish that it is entitled to assert the United States' sovereign immunity for two reasons. First, the United States owed a duty of care to Contango, and the court has concluded that the United States breached that duty. Because the discretionary function exemption does not apply, the court therefore concludes that there is no governmental immunity from which an immunity may be derived for the benefit of Weeks Marine. Second, as explained above, Weeks Marine has failed to establish that it acted without negligence.

## F.  Contributory Negligence of Contango

The United States and Weeks Marine contend that Contango was negligent because it failed to bury its pipeline to the proper depth. The General Criteria for Pipeline and Utility Line Burial in Waterways ("Criteria"), issued by the New Orleans District, listed the required burial depths of pipelines in navigable waters within the New Orleans District, which included the Atchafalaya Bar Channel.[45] Under the Corps' Criteria pipelines buried in fairways in water less than 200 feet deep were required to be buried at least ten feet below the mud line. Because the Atchafalaya Channel

---

[45]Contango Exhibit 125.

-34-

is a federally maintained dredged channel, however, the United States and Weeks Marine argue that under the Corps' Criteria the burial requirement for pipelines crossing the Atchafalaya Channel was eight feet below the authorized project depth, rather than ten feet below the mud line.

Contango's consultants concluded that the seafloor of the Atchafalaya Channel varied between -16 to -18 feet deep relative to Mean Low Gulf ("MLG"). The coated pipeline was two feet in diameter. In order for the top of the pipeline to be buried eight feet below the authorized project depth the United States argues that the pipeline should therefore have been buried to -28 feet MLG. Contango's permit application stated that the pipeline be buried at least ten feet below the mud line at the bottom of the channel.[46] The Corps approved Contango's application, and the permit issued by the Corps to Contango required that Contango bury the pipeline at least ten feet below the mud line where it crossed the Atchafalaya Channel and at least three feet below the mud line outside the channel.[47]

The credible evidence at trial established that Contango buried the pipeline at least ten feet below the mud line,[48] and that the pipeline was also buried below -28 feet MLG except in one small

---

[46]Contango Exhibit 7 at page PLTF 6521.

[47]Contango Exhibit 8 at page US 27, ¶ 11, and page US 37.

[48]E.g., Contango Exhibit 75 at page PLTF 456.

-35-

area at the western edge of the channel where it was buried to -27.5 MLG,[49] although even in that area the pipeline was buried at least 10 feet below the mud line as required by the Corps' permit.[50]

The court concludes that the burial depth of the Contango pipeline complied with the permit issued by the Corps both within and outside the Atchafalaya Channel.  Neither the United States nor Weeks Marine has presented credible evidence that Contango violated the Corps' permit or breached a duty of reasonable care as to the buried depth of the pipeline.  Nor has the United States or Weeks Marine presented any credible evidence that the failure of Contango to bury the pipeline to -28 feet MLG at the western edge of the channel caused the Weeks Marine dredge to strike the pipeline approximately 15 feet beyond the western edge of the channel, where it was buried at least three feet below the mud line.[51]  The United States and Weeks Marine have therefore failed to show that Contango was contributorily negligent because it failed to bury the pipeline deep enough.

## G.    Allocation of Fault

Under general maritime law negligent defendants are jointly and severally liable for the plaintiff's damages.  Coats v. Penrod Drilling Corp., 61 F.3d 1113, 1129 (5th Cir. 1995).    The

---

[49]E.g., Contango Exhibit 80 at page PLTF 411.

[50]E.g., Contango Exhibit 10.

[51]E.g., Contango Exhibit 75 at page PLTF 456.

United States and Weeks Marine are both at fault for the allision and Contango's damages, and neither is entitled to shift all blame to the other because each owed independent duties to exercise reasonable care to avoid damaging Contango's pipeline, and each could have prevented the allision through the exercise of reasonable care.  See Combo Maritime, 615 F.3d at 608-09 (discussing the effect of THE LOUISIANA rule on apportionment of liability); cf. Beene v. Terrebonne Wireline Servs., Inc., 990 F.2d 627, 1993 WL 117984, at *2 (5th Cir. 1993) (unpublished table decision) (discussing the effect of THE PENNSYLVANIA rule on apportionment of liability); Sheridan Transp. Co. v. United States, 834 F.2d 467, 478 (5th Cir. 1987) (same). Contango does not bear any fault because it buried the pipeline in accordance with the pipeline permit issued by the Corps.

Between the two defendants, the court concludes that the United States is responsible for 60% of Contango's damages and that Weeks Marine is responsible for 40%.  Although the court has concluded that Weeks Marine's sole reliance on pipeline locations information provided by the Corps did not satisfy the duty of Weeks Marine to exercise reasonable care in its dredging operations, the credible evidence at trial established that it was the common practice in the dredging industry at the time of the allision to rely on pipeline information provided by the Corps, and that the Corps was aware of this practice.  The court therefore concludes

-37-

that between the defendants, the Corps has the greater responsibility for the allision and Contango's damages.

**H.    Damages**

Contango seeks damages for the cost to repair its pipeline (both insured and uninsured), for hydrocarbons lost because of the allision, and for deferred production damages resulting from the shut-in of the pipeline and wells for thirty-five days.  The court finds that Contango suffered the following damages as a result of defendants' negligent conduct.

1.  <u>Repair Costs</u>

The parties have stipulated that the plaintiff Underwriters paid $2,920,528.80 to repair the pipeline.[52]  Contango incurred $534,634.03 in uninsured costs to repair the pipeline.[53] Defendants argue that $106,062.38 of this amount is not recoverable because Contango "bettered" the pipeline by burying it deeper as part of the repairs.  The court rejected this argument at trial and concludes that Contango is entitled to recover $534,634.03 in uninsured repair costs.

2.  <u>Lost Hydrocarbons</u>

Although the United States initially argued that because the working interest owners were not parties, they were not entitled to

---

[52]Joint Stipulation Regarding Actual Damages, Docket Entry No. 108.

[53]<u>Id.</u> ¶ 2.a & c.

recover damages for lost hydrocarbons, that objection became moot when the court allowed the plaintiffs to file a Second Amended Complaint adding the working interest owners as plaintiffs. The court therefore concludes that Contango is entitled to $78,073.00 for lost hydrocarbons.[54]

3.   Deferred Production Damages

The principal dispute concerning damages relates to Contango's deferred production damages. Using a discount rate of 8%, Contango argues that it is entitled to recover $7,981,927.00 in deferred production damages.[55]   Conceptually, deferred production damages represent the difference between the value of gas and condensate that Contango would have produced during the thirty-five days when its wells were shut-in and the present value of that same product when it is actually produced over the remaining life of the wells. See Nerco Oil & Gas, Inc. v. Otto Candies, Inc., 74 F.3d 667, 669-70 (5th Cir. 1996); Agip Petroleum Co. v. Gulf Island Fabrication, Inc., 17 F. Supp. 2d 660, 661 (S.D. Tex. 1998) ("The practical and economic measure of an oil company's loss from delayed production is the difference between the net revenue flow

---

[54]Id. ¶ 2.b.i.

[55]Contango contends that the court should apply a discount rate of 10% based on the SEC standard for valuing oil and gas properties for purposes of SEC reporting. However, both Contango's expert and the government's expert testified that 8% is a proper discount rate to apply in this case. The court finds this testimony to be credible and adopts an 8% discount rate.

with and without the delay.").[56]   The parties agree that the
"incident v. no incident" methodology is the appropriate method for
calculating deferred production damages in this case.   See In re
ENSCO Offshore Co., No. H-09-2838, 2014 WL 49980, at *3-4 & n.1
(S.D. Tex. Jan. 7, 2014) (discussing the incident v. no incident
methodology); Certain Underwriters Subscribing to Burke Daniels
Policy No. BD-CJP-132 v. Commerce & Indus. Ins. Co., No. 97-0491,
2000 WL 98205, at *3 n.5 (E.D. La. Jan. 27, 2000), amended,

---

[56]The court in Agip Petroleum distinguished between a method
of calculating deferred production damages as lost revenue during
the period of delay "less credit for the gas retained in the
reservoir, with the credit being the price of the gas discounted
from the end of the reservoir's productive life" and a method that
calculated "the difference between the net revenue flow with and
without delay," which it likened to the process of "pricing two
annuities," but noted that mathematically the result is the same
for each method.   17 F. Supp. 2d at 660-62.   Each method has
conceptual advantages.   The first recognizes that if the reservoir
is unaffected by the delay, then before the wells go into decline
variations in production in any particular month are not
necessarily attributable to the fact that the wells were not
producing during the delay.   Once the wells go into decline,
however, the amount of product produced in any particular month is
assumed to be higher than it would have been absent the delay
because it is assumed that the well would have gone into decline
earlier had the delay not occurred.   As explained at trial, a well
goes into decline when natural factors, such as pressures within
the reservoir, are no longer sufficient to support production at
the scheduled rate and production thereafter declines over time
until the reservoir is depleted or abandoned.   The second method
recognizes that the production of each molecule of product has been
delayed by some amount of time and seeks to quantify the cost of
this delay on each unit of product as it is produced.   Both methods
are useful for understanding what deferred production damages are
meant to represent.   And, as noted by the court in Agip Petroleum,
the result is the same so long as the credit for production at the
end of the reservoir's productive life is calculated on the change
in  production caused by the delay over the entire period that the
wells are in decline.   See id. at 662.

No. 97-0491, 2000 WL 256199 (E.D. La. Mar. 2, 2000), aff'd, 273 F.3d 393 (5th Cir. 2001).

Each party presented its own expert on deferred production damages at trial. Contango's expert, Calvin Barnhill, a petroleum engineer, utilized a decline curve model wherein he produced two forecasts -- one for the incident scenario and one for the hypothetical no-incident scenario. For the incident scenario Barnhill forecast production over the life of the well from the date that the wells returned to production after the shut-in and verified his projections against actual production data for the period when it was available. For the no-incident scenario Barnhill forecast production from the date of the allision assuming that the incident had never occurred. Each forecast was discounted to present value and compared to determine the amount of deferred production damages.

Weeks Marine's expert, Michael Veazey, a petroleum engineer, also produced two forecasts. For the incident scenario, Veazey used actual sales data derived from Contango's lease operating statements from the date of the allision through December of 2011. He then produced a production forecast for the remaining life of the wells. In order to produce his forecast, Veazey performed a nodal analysis considering both bottom hole pressure and flowing tubing pressure in each of Contango's wells. Veazey utilized a pressure-related function referred to as "p over z" and the material balance method to predict production over the remaining

life of the wells from December of 2011.  The combination of actual data from February 24, 2010, to December 31, 2011, and forecast data thereafter represents the entirety of Veazey's production forecast for the incident scenario.  For the no-incident scenario Veazey moved his incident forecast backward in time by thirty-five days.  Each forecast was discounted to present value and compared to determine the amount of deferred production damages.

Contango argues that Veazey's model is unreliable because it utilizes actual sales data derived from Contango's lease operating statements for the period from February 24, 2010, to December 31, 2011, before switching to model projections thereafter.[57]  Contango contends that Veazey's combination of actual data with model projections in his forecast is erroneous because the sales data includes accounting adjustments that are not adequately taken into consideration in Veazey's production forecast after December of 2011.[58]  Barnhill's model, Contango argues, is more reliable because it utilizes model projections for the entirety of both the incident and no-incident scenarios.[59]  Contango also argues that Veazey's model is unreliable because its projections deviate significantly from the actual production data that is available.[60]

---

[57]Plaintiffs' Post-Trial Brief on Deferred Production Damages, Docket Entry No. 162, pp. 4-8.

[58]Id.

[59]Id. at 3-4.

[60]Id. at 7-8.

Weeks Marine argues that Barnhill's model fails to account for the fact that the wells are producing from an abnormally pressured depletion drive reservoir.[61]  Weeks Marine contends that Barnhill's use of a decline curve methodology based on production rather than a methodology based on pressures is unreliable in the context of an abnormally pressured reservoir because the rate of production can be artificially manipulated by opening and closing the chokes on the wells.[62]  Weeks Marine further argues that the decline curve method has the potential to over-estimate the life of the wells because the rate of decrease in downhole pressures can indicate a shorter well life than rates of production would predict.[63]  By focusing on downhole pressures and nodal analysis Weeks Marine argues that Veazey's model more accurately predicts the point at which the wells will cease to be able to produce on their own without artificial assistance.[64]  Weeks also disputes Contango's assertion that Veazey's utilization of actual sales data for a portion of his model makes it unreliable.[65]

Well life can be roughly described as a function of both remaining reserves and the rate of production.  Even if reserves

---

[61]Defendant Weeks Marine, Inc.'s Post-Trial Brief Replying to Plaintiffs' Post-Trial Brief on Deferred Production Damages, Docket Entry No. 166, pp. 1-4, 7-8.

[62]Id.

[63]Id.

[64]Id.

[65]Id. at 6-7.

are lower than projected, the well life may be longer if those reserves are produced at a slower rate. Generally, a longer well life translates to larger deferred production damages. Thus, even if the experts agreed on the remaining reserves, they might disagree on how long it will take to produce them.

Weeks Marine argues that the rate of production is an unreliable indicator of the remaining life of the well. However, rate of production is the predominant factor in determining the plaintiffs' deferred production damages. While the material balance method may be an adequate method for determining the amount of remaining reserves, the court is not convinced that Veazey's particular model accurately projects the rate at which those reserves will be produced. If the remaining reserves are produced over a relatively short period of time, the deferred production damages will be lower. If the rate of production for the remaining reserves is slower, the remaining reserves will be produced over a longer period of time and deferred production damages will be higher. Thus, accurately projecting the rate of production is essential to determining the proper measure of Contango's deferred production damages.

Of course, the wells cannot produce what the reservoirs do not contain, and at some point the pressures within the reservoir will no longer support a particular rate of production. Veazey's estimate of remaining reserves was lower than Barnhill's estimate. Weeks Marine argues that Veazey's estimate is more reliable because

it is based on an analysis of downhole pressures that cannot be manipulated in the same way as rates of production -- by opening and closing the chokes on the wells. However, Barnhill testified that he was aware that Contango's wells are producing from an abnormally pressured reservoir,[66] that he considered nodal analysis,[67] downhole pressures,[68] material balance,[69] and the p over z factor,[70] and concluded that his model was accurate.[71] The court finds Barnhill's testimony to be credible.

Essentially, Weeks Marine's critique of Barnhill's model is that it relies too heavily on production data. Veazey's model, on the other hand, may rely too heavily on pressure data. Veazey used pressure decline to predict production decline. Veazey acknowledges, however, that production can be manipulated by opening and closing the chokes on the wells.[72] Thus, production cannot be predicted solely by assessing the pressures within the reservoir -- there may be economic or other factors that can explain or predict the rate at which the wells are likely to produce.

---

[66]Trial Transcript, Vol. 1, pp. 121:21-122:20, 133:20-134:18.

[67]Id. at 125:7-125:21.

[68]Id.

[69]Id. at 122:12-:20; see also January 18, 2013, Expert Report of Calvin C. Barnhill, Contango Exhibit 122, p. 10.

[70]Trial Transcript, Vol. 1, pp. 39:23-40:7, 86:17-87:10, 122:2-:9.

[71]Id. at 122:2-:20, 133:20-134:18.

[72]Trial Transcript, Vol. 2, pp. 219:24-220:3, 229:10-230:16.

Veazey referred to the variations in production from month to month as "chatter" in the rate of production.[73]  However, Veazey acknowledged that these variations can be attributed to the opening and closing of chokes on the well in response to legitimate financial and operational concerns.[74]  Such concerns are relevant to determining how the wells can be expected to produce in the future.

Veazey's model fully incorporates this "chatter" (and potentially problematic accounting adjustments) into its calculation of deferred production damages for the period before December 31, 2011, which consists of data derived from Contango's lease operating statements.  It is unclear to the court, however, whether Veazey's model adequately accounts for those legitimate factors unrelated to reservoir pressure that can be expected to influence the rate of production over the remaining life of the well after December of 2011.  While reservoir pressure is undoubtedly a significant factor in a well's rate of production, it is not the only factor.

Contango may have economic and operational reasons for speeding or slowing production.  These factors may be independent of the particular characteristics of the reservoir.  Nonetheless, they would affect the rate of production, and it is the rate of

---

[73]_Id._ at 229:1-230:16.

[74]Trial Transcript, Vol. 2, pp. 229:24-230:16.

production that will largely determine the amount of Contango's deferred production damages. Indeed, revenue from production over the remaining life of the wells is what the models are intended to predict. See <u>Nerco Oil & Gas</u>, 74 F.3d at 669-70; <u>Certain Underwriters Subscribing to Burke Daniels Policy No. BD-CJP-132</u>, 2000 WL 98205, at *3 n.5; <u>In re TT Boat Corp.</u>, No. 98-0494, 1999 WL 1276837, at *3-*4 (E.D. La. Dec. 21, 1999); <u>Agip Petroleum</u>, 17 F. Supp. 2d at 661-62.

Contango is not obligated to adjust its production schedule in order to minimize its deferred production damages at the expense of its legitimate economic and operational reasons for producing at a particular rate. Contango is therefore entitled to deferred production damages in accordance with its reasonable and legitimate management of the production rates of its wells.

Barnhill testified that he compared his projections to observed production as the data became available in order to verify that his projections were accurate and adjust his model when necessary.[75] Because Barnhill verified his projections against actual production data as it became available, the court can infer that his model accounts for the factors relevant to Contango's particular production profile. At trial, when Veazey was asked why his projections for a particular well were lower than what the well actually produced, Veazey replied that Contango "opened the choke,

---

[75]Trial Transcript, Vol. 1, pp. 40:13-41:1, 90:16-96:24, 131:23-133:5.

or they did something else to manipulate, artificially manipulate the reservoir."[76]  The court can therefore infer that Veazey's model may not account for the non-pressure-related factors relevant to Contango's production profile as accurately as Barnhill's model does.  Having found neither expert's estimate of remaining reserves to be more credible than the other's and finding Barnhill's model more reliable in predicting the rate of production, the court therefore concludes that Barnhill's model is more reliable than Veazey's model.

The government's expert, Ann Czerwonka, an expert in applied financial and quantitative analysis, used regression analysis to critique Barnhill's model.  Contango argues that Czerwonka is not qualified to render opinions in this case because she is not a petroleum engineer.  Czerwonka's analysis indicated that Contango's wells began to decline immediately after the shut-in.  Barnhill and Veazey, both petroleum engineers, disagreed with her assessment. Even if Czerwonka is qualified as an expert on deferred production damages, the court finds Barnhill to be more qualified by experience and his methodology to be more reliable.  Because the court finds Barnhill's model to be more reliable than either Veazey's or Czerwonka's, using Barnhill's methodology and using an 8% discount rate, Contango's deferred production damages were $7,981,927.00.  Contango will be awarded deferred production damages in this amount.

---

[76]Trial Transcript, Vol. 2, pp. 259:7-260:8.

## I.   Prejudgment Interest

The general rule is that prejudgment interest should be awarded in maritime collision cases. <u>City of Milwaukee v. Cement Div., Nat. Gypsum Co.</u>, 115 S. Ct. 2091, 2095 (1995). "The essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss." <u>Id.</u> "Admiralty courts enjoy broad discretion in setting prejudgment interest rates." <u>Gator Marine Serv. Towing, Inc. v. J. Ray McDermott & Co.</u>, 651 F.2d 1096, 1101 (5th Cir. 1981). The court "may look to the judgment creditor's actual cost of borrowing money, to state law, or to other reasonable guideposts indicating a fair level of compensation." <u>Id.</u> (citations omitted).

Contango argues that the court should look to Texas law for the prejudgment interest rate.[77] The prejudgment interest rate in Texas is equal to the prime rate with a floor of 5% and a ceiling of 15%. <u>See</u> Tex. Fin. Code §§ 304.003, 340.103; <u>Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.</u>, 962 S.W.2d 507, 532 (Tex. 1998). It is computed as simple interest. Tex. Fin. Code § 304.104; <u>Johnson & Higgins</u>, 962 S.W.2d at 532. Weeks Marine argues that the court should award prejudgment interest at the rate established by 28 U.S.C. § 1961 for post-judgment interest, at the

---

[77]Plaintiffs' Post-Trial Brief in Support of Request for Prejudgment Interest ("Plaintiffs' Post-Trial Brief"), Docket Entry No. 171, pp. 6-8.

average prime lending rate of 3.25%, or at the Louisiana statutory rates of 3.75% for 2010 and 4% for 2011.[78]

The court concludes that 5% is an appropriate rate to fairly compensate Contango "for the loss of use of money due as damages from the time the claim accrue[d] until judgment is entered," and to restore Contango "to the condition it enjoyed before the injury occurred." City of Milwaukee, 115 S. Ct. at 2096 (citations omitted) (internal quotation marks omitted). Accordingly, the court will award prejudgment interest at the rate of 5% per year from February 24, 2010, until the date preceding the date that judgment is entered. Applying the prejudgment interest rate of 5% per year for 1,491 days to Contango's damages ($11,515,162.83) yields a prejudgment interest award of $2,351,932.57.

Under 46 U.S.C. § 30911, "[a] judgment against the United States . . . may include costs and interest at the rate of 4 percent per year until satisfied." Furthermore, "interest is not allowable for the period before the action is filed." Id. Accordingly, the court concludes that the United States' liability for prejudgment interest is limited to 4% from the date that suit was filed on February 11, 2011, or $1,796,680.89.

---

[78]Defendant Weeks Marine, Inc.'s Response to Plaintiffs' Post-Trial Brief in Support of Request for Prejudgment Interest, Docket Entry No. 172, pp. 3-5.

Contango argues that it should be permitted to recover the portion of the total award of prejudgment interest that it is statutorily barred from recovering against the United States under 46 U.S.C. § 30911 from Weeks Marine as a jointly-and-severally-liable tortfeasor.[79] The court agrees. See Probo II London v. ISLA SANTAY MV, 92 F.3d 361, 364-65 (5th Cir. 1996); Transorient Navigators Co., S.A. v. M/S SOUTHWIND, 788 F.2d 288, 293-94 (5th Cir. 1986). "In admiralty cases 'prejudgment interest is not awarded as a penalty but as compensation for use of funds by the defendant to which the plaintiff is entitled." Transorient Navigators, 788 F.2d at 294. Furthermore, an admiralty plaintiff "may recover his full damages from any one of two or more joint tortfeasors, leaving that tortfeasor to seek contribution or indemnity from its co-tortfeasors." Id. Accordingly, Contango is entitled to recover the entire award of prejudgment interest from Weeks Marine, including the portion of prejudgment interest that it is statutorily barred from collecting against the United States.[80] See id.

---

[79]Plaintiffs' Post-Trial Brief, Docket Entry No. 171, pp. 8-10.

[80]The United States is not liable in contribution to Weeks Marine for the amount of prejudgment interest it is statutorily protected from paying. See Transorient Navigators, 788 F.2d at 294-95.

### III.   Conclusion[81]

If any finding of fact should more properly be characterized as a conclusion of law, it is hereby adopted as a conclusion of law.   If any conclusion of law should more properly be characterized as a finding of fact, it is hereby adopted as a finding of fact.

On the basis of the above findings of fact and conclusions of law, the court concludes that Weeks Marine and the United States must compensate Contango in the amount of $2,920,528.80 for insured repair costs, $534,634.03 for uninsured repair costs, $78,073.00 for lost hydrocarbons, $7,981,927.00 for deferred production damages, $2,351,932.57 for prejudgment interest, post-judgment interest at a rate of 0.14% compounded annually on the sum of these awards, and for Contango's costs allowed under 28 U.S.C. § 1920.

All other relief not expressly granted is **DENIED**.

**SIGNED** at Houston, Texas, on this 26th day of March, 2014.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE

---

[81]The court has considered the parties' other arguments raised in the pretrial order.  The fact that the court has not expressly addressed them in this Memorandum Opinion and Order reflects the court's conclusion that they lacked merit and/or that the party asserting the argument failed to prove it at trial.